UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

− − − − − − − − − − − − − − − − − − − − − − − − − − X

9384-2557 Québec Inc., a Canadian corporation;  :
MINEDMAP, INC., a Nevada limited liability
company; and SERENITY ALPHA, LLC, a
Nevada corporation,

                        Plaintiff,          :

                    against           :

NORTHWAY MINING, LLC, a New York      :
limited liability company; MICHAEL
MARANDA, an individual; MICHAEL
CARTER, an individual; CSX4236
MOTORCYCLE SALVAGE, LLC, a New York
limited liability company; DROR SVORAI, an
individual; MINING POWER GROUP, INC., a
Florida corporation; HUDSON DATA CENTER,
INC, a New York Corporation,

                  Defendants.    :

− − − − − − − − − − − − − − − − − − − − − − − − − − X

1:19-CV-1994

**COMPLAINT**

     Plaintiffs, 9384-2557 Québec Inc., MinedMap, Inc, and Serenity Alpha, LLC, through

their counsel, T. Edward Williams, Esq., for their Complaint, alleges as follows:

<u>INTRODUCTION</u>

1.     In this lawsuit, Plaintiffs seek relief under nine causes of actions.  Plaintiffs seek relief

against Defendants for: (i) violation of the RICO Statute, 18 U.S.C. § 1961, with the predicate

acts of criminal mail fraud, 18 U.S.C. § 1341 and criminal wire fraud, 18 U.S.C. § 1343; (ii)

replevin for the immediate return of certain bitcoin mining machines; (iii) civil conspiracy; (iv)

conversion; (v) fraud; (vi) breach of the Hosting Agreements; (vii) fraudulent transfers between the Defendants and third parties; and (viii) unjust enrichment.

2.      Demand for bitcoins increased bitcoin companies' need to create (or mine) more bitcoins. Around August 2018, the Plaintiffs were seeking a facility to host their bitcoin mining machines ("Miners") to allow them to mine bitcoins.  A properly equipped bitcoin hosting facility can host thousands of Miners simultaneously.  To be able to host thousands of Miners, the facility must have access to abundant electricity.  The facility hosting the Miners will require the Miners' owners to make a large deposit with the hosting facility to allow the hosting facility to pay for electrical costs.    The hosting facility and the Miners' owners will then enter into a hosting agreement.

3.      In this case, the Plaintiffs sent more than 3,600 miners to Defendants, Michael Maranda and Northway to Northway's facility in Coxsackie, New York (the "Facility").  Defendants represented that the Facility could host thousands of Miners; and that the Facility had access to abundant electrical power either through traditional power sources or through access to solar power.  Based on these and other representations, Plaintiffs made large deposits with Defendants, but Defendants did not use the funds to purchase electrical power.  Instead, Defendants used the funds to purchase personal items, pay mortgages on personal homes they own, and other similar purchases.  In addition, as many early employees have stated, Defendants knew as of June 2018, that the Facility was not capable of hosting 200 Miners, much less over 3,600 Miners.  Defendants collectively defrauded Plaintiffs and Plaintiffs are entitled to damages against Defendants.

## PARTIES

### A.  Plaintiffs

4.     Plaintiff, Serenity Alpha, LLC ("Serenity"), is a Nevada limited liability company. Serenity is a bitcoin mining company with investors in South Korea, Singapore, and around the world.

5.     Plaintiff, MinedMap, Inc. ("MinedMap"), is a Nevada corporation and is the parent company of Serenity.  MinedMap, like Serenity, is a bitcoin mining company that specializes in owning and purchasing bitcoin mining machines.

6.     Plaintiff, 9384-2557 Québec Inc. ("Québec Inc."), is a Canadian Corporation with its principle place of business at 395-4480 Chemin de la Coté de Liesse, Montreal, Quebec H4N 2 RI.

### B.  Defendants

7.     Defendant, Northway Mining, LLC ("Northway"), is a New York limited liability company, with a physical office at 7014 13th Avenue, Suite 202 Brooklyn, New York 11228. Northway also has its Registered at 7014 13th Avenue, Suite 202 Brooklyn, New York 11228.

8.     Defendant, Mining Power Group, Inc. ("Mining Power"), is a Florida corporation and the parent company of Northway.  Mining Power holds itself out as a financing company that does business in the United States and abroad.  Mining Power has a principle place of business at 20200 Dixie Highway Suite 906 Miami, Florida 33180.  Mining Power's registered agent is also located 20200 Dixie Highway Suite 906 Miami, Florida 33180.  Mining Power claims its shares are traded on the Over-The-Counter Market ("OTC Market").

9.      Defendant, Michael Maranda, ("Maranda"), is an individual who represents himself as the CEO of Northway.  Maranda's last known address is:  38 Oaklawn Avenue Farmville, NY 11738.

10.     Defendant, Dror Svorai ("Svorai"), is an individual who owns 55 percent of Northway through Mining Power.  Svorai may be served at 20200 Dixie Highway Suite 906 Miami, Florida 33180.

11.     Defendant, Michael Carter, is an individual residing in New York.  Michael Carter has been stealing Serenity and MinedMap's Miners in an effort to assist Maranda, Svorai, Northway, and other Defendants.  Michael Carter has stated that service may be had on him at his attorney's office at   28 2nd Street Troy, New York 12180.

12.     Defendants, Hudson Data Center, Inc. ("Hudson"), is a New York Corporation and its Registered Agent is Michael Maranda.   Hudson may be served at 38 Oaklawn Avenue Farmingville, New York 11738.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter under 28 U.S.C. 1331, federal question jurisdiction, as this action arises out of, among other federal statutes, violation of federal statutes including, 18 U.S.C. § 1961, et seq. (the "RICO Act"); 18 U.S.C. § 1343 ("Wire Fraud"); and 18 U.S.C. § 1341 ("Mail Fraud").  This Court also has jurisdiction over this matter under 28 U.S.C. § 1332, diversity jurisdiction, because, Plaintiffs and Defendants are completely diverse and because the amount in controversy far exceeds $75,000.00.  Further, jurisdiction in this Court is premised on pendant or supplemental jurisdiction over Plaintiffs' claims brought pursuant to New York state law.

14.     Venue in the Federal District Court for the Eastern District of New York is proper under 28 U.S.C. § 1391 because at least one of the Defendants has an office or its Registered Agent at 7014 13th Avenue, Suite 202 Brooklyn, New York 11228.

## GENERAL ALLEGATIONS

15.     On June 4, 2018, Maranda registered Northway with the New York Secretary of State.

16.     Between June and July 2018, Maranda hired Ryan Lehman ("Lehman"), his twenty-one-year-old nephew, as Chief Financial Officer ("CFO") of Northway.

17.     Maranda paid Lehman a salary and gave him five percent of Northway's issued shares.

18.     Between July and August 2018, Maranda hired three other individuals to work for Northway.

19.     Maranda instructed Lehman to open a bank account for Northway at M&T Bank.

20.     To get around banking regulations of bitcoin companies, Maranda instructed Lehman to tell M&T Bank that Northway was not in any way involved with the bitcoin or with bitcoin companies.

21.     Lehman opened the bank account at M&T Bank and represented to M&T Bank that Northway was not involved with the bitcoin industry.

22.     In July 2018, Maranda hired Joseph Stefanelli ("Stefanelli"), a broker with connections to bitcoin companies in the United States and abroad.

23.     In exchange for introducing Maranda to bitcoin companies, Northway agreed to pay Stefanelli a finder's fee.

24.     Northway did not disclose that Stefanelli's fee would be paid from deposits made by the bitcoin companies to Northway.

25.     Maranda told Stefanelli to tell bitcoin companies that the following: (i) Northway had a large mining Facility; (ii) Northway's Facility had access to abundant power at competitive prices and (iii) Northway could host *thousands* of Miners at any given time at its Facility.

26.     Around August 2018, Québec Inc., MinedMap, and Serenity were all seeking a Company to host their Miners.

27.     In August 2018, Stefanelli met Jason Girosan ("Mr. Girosan") and Gabriel Cyr ("Mr. Cyr") of Québec Inc.

28.     Stefanelli told Mr. Girosan and Mr. Cyr that Northway's Facility could host thousands of Miners, simultaneously.

29.     Stefanelli told Mr. Girosan and Mr. Cyr that Northway had access to abundant electrical power.

30.     On September 9, 2018, Mr. Girosan and Mr. Cyr traveled to New York to meet Mr. Maranda and to review the Facility.

31.     Maranda met with Mr. Girosan and Mr. Cyr while they reviewed the Facility.

32.     During this visit, Maranda again stated that the Facility had access to abundant electrical power and that the Facility was able to host thousands of Miners, simultaneously.

33.     Neither Mr. Girosan nor Mr. Cyr could test Maranda's assertions about the capabilities of the Facility.

34.     Although no staff was present for this meeting, Maranda represented that Northway had electrical engineers, among other staff, to care for and maintain the Miners.

35.     On September 9, 2018, based on Maranda's representations, Québec Inc. sent 700 of its Miners to Northway for Northway to host.

36.     On September 10, 2018, Québec Inc. sent Maranda $46,746.09, as a deposit towards the electrical costs for hosting its Miners.

37.     On September 18, 2018, the parties executed the hosting agreement and Québec Inc. deposited an additional $23,255.66 with Northway.  See Hosting Agreement between Québec Inc. and Northway ("Agreement I"), attached as **Exhibit 1**.

38.      Northway was to have Québec Inc.'s Miners plugged in and operating by September 23, 2018.  Id. at 1–2.

39.     On September 21, 2018, Québec Inc. deposited an additional $23,824.42 with Northway as the final deposit payment.

40.     By September 24, 2018, Québec's Miners still had not been plugged in.

41.     On that same day, Québec Inc. inquired about why its Miners had not been plugged in, but Maranda did not immediately respond.

42.     When Maranda responded, he claimed that the Power Distribution Unit ("PDU") and the power racks were defective.

43.     Maranda promised to have Québec Inc.'s Miners plugged in on or before September 25, 2018, notwithstanding the defects in the PDU and the power racks.

44.     On September 25, 2018, Mr. Girosan and Mr. Cyr checked to see whether Québec Inc.'s Miners had been plugged in and learned that Québec's Inc.'s Miners had not been plugged in.

45.     On that same day, Mr. Girosan and Mr. Cyr communicated with Mr. Maranda about Québec Inc.'s Miners.

46.     Maranda responded that the replacement power racks and PDUs were also defective and stated that he had scheduled repair for September 28, 2018.

47.     By September 29, 2018, Québec Inc.'s Miners still had not been plugged in.

48.     Around that same time, a third party, who was familiar with Northway's Facility, told Québec Inc.  that Northway's Facility was not able to host Québec Inc.'s 700 Miners because the Facility was not capable of transferring the power needed to operate 700 Miners.

49.     Maranda knew in at least June 2018, that the Facility was not capable of hosting 700 Miners.

50.     In fact, as of June 2018, Maranda knew that the Facility could not host more than 200 Miners.

51.     Maranda also knew that the did not have the know-how to install or maintain the Miners.

52.     On October 4, 2018, Mr. Girosan and Mr. Cyr arranged to have Québec Inc.'s 700 Miners returned to Montreal.

53.     In exchange for allowing Québec Inc.' to take its Miners, Northway attempted to settle with Québec Inc. and have it release all claims against Northway.

54.     Québec, Inc. refused Northway's settlement offer.

55.     Québec Inc. picked up its Miners on or around October 5, 2018.

56.     Québec Inc. also requested the return of its deposits of **$46,746.09**, **$23,255.66**, and **$23,824.42** for a total of **$93,826.17** because its deposits had not been spent on electrical power since the Miners were never plugged in.

57.     Québec Inc. also demanded refund of other sums it had paid to Northway and all costs it had incurred in transporting and removing its Miners from the Facility.

58.     Northway refused to pay Québec Inc. the $93,826.17 or the other sums owed to Québec Inc.

59.     Northway retained John F. Harwick, Esq., of E. Stewart Jones Hacker Murphy and sued Québec Inc.

60.     Northway did not serve the Complaint on Québec Inc.

61.     In addition, it is unclear whether Northway even filed the complaint with a court of competent jurisdiction over Québec Inc.

62.     Northway's complaint was an effort to intimidate Québec Inc.

63.     In late-October 2018, Lehman and the three other employees quit Northway.

64.     Lehman and the other employees quit because they knew Maranda was defrauding bitcoin companies.

65.     Specifically, Lehman and the other employees saw Maranda misused funds deposited into Northway.

66.     They saw, for example, Maranda use Québec Inc.'s to purchase cars, make down payments on a condo in Miami, make mortgage payments on personal properties in New York, pay for

lavished suites in various hotels, and on other personal expenses unrelated to purchasing electricity to operate Québec's Inc.'s Miners.

67.    The funds Québec Inc. deposited with Northway did not belong to Québec Inc. but to Québec Inc.'s investors.

68.    Québec Inc.'s business reputation has been damaged by Maranda's actions.

69.    Like Québec Inc., Stefanelli met Daniel Kim ("Mr. Kim") and Allen Song ("Mr. Song") of MinedMap and Serenity in August 2018.

70.    In September 2018, Mr. Kim and Mr. Song visited the Facility, but Maranda was not at the Facility on that day.

71.    Mr. Song visited the Facility on three other occasions between September and October 2018.

72.    Maranda did not tell Mr. Song or Mr. Kim that just he had misrepresented the capability of the Facility to Québec Inc.  In addition, Maranda did not tell Mr. Song or Mr. Kim that Québec Inc. had requested the withdrawal of its Miners and requested its deposits because Northway was not able to perform under **Agreement I**.

73.    Maranda was present the three times Mr. Song visited the Facility.

74.    During Mr. Song's visit in September 2018, Maranda represented that Northway had recently obtained $1 million dollars in funding.

75.    The $1 million funding came from Mining Power Group, Inc. ("Mining Power") and Dror Svorai ("Svorai").

76.     According to Maranda, Northway was so well capitalized that the $1 million capital infusion would be spent on purchasing another facility in Illinois.  *See Pitch Brochure, attached hereto as **Exhibit 2**.*

77.     Maranda caused items to be mailed to MinedMap and Serenity showing that Northway had obtained additional $1 million dollars in capital that would allow it to expand.

78.     Neither Mining Power, Maranda, nor Svorai put $1 million into Northway.

79.     In fact, Northway was (and still is) chronically undercapitalized.

80.     Instead, Maranda, Svorai, and Mining Power had agreed to tell Mr. Song and issue a press release that were designed to induce Mr. Song and Mr. Kim to allow Northway to host Serenity and MinedMap's Miners.  *See Press Releases attached hereto as **Exhibit 3**.*

81.     Further, the claim that Northway had received $1 million dollars in funding was concocted by Maranda, Svorai, and Mining Power to induce prospective bitcoin companies, like the Plaintiffs, to enter into hosting agreements with Mining Power.

82.     Neither Maranda nor Svorai had access to $1 million dollars when they made these representations.

83.     In fact, by the time Maranda met Mr. Kim and Mr. Song, Maranda was using deposits to live on as he had no other sources of income.

84.     On September 21, 2018, based on Maranda's various assertions, MinedMap and Serenity entered into a hosting agreement with Northway Mining.  *See Hosting Agreement between MinedMap and Northway ("Agreement II"), attached hereto as **Exhibit 4**.*

85.    Under the hosting agreement with MinedMap and Serenity, MinedMap and Serenity were to pay Northway the following: (i) costs for electricity for operating the their Miners; (ii) costs associated with maintaining the Miners at proper temperature and ensuring the physical condition in which the Miners were stored were optimal; (iii) repairs costs plus a 10% mark up; (iv) internal labor Northway may incur in storing the miners; and (v) other costs directly related to storing the Miners.  *Id.*

86.    On September 21, 2018, MinedMap and Serenity wired $162,000.00 to Northway as a deposit on the electrical costs Northway was to incur hosting MinedMap and Serenity's Miners.

87.    In addition, almost one week later, MinedMap and Serenity wired an additional $270,000.00 as pay for electrical power for its Miners.

88.    Between October 8, 2018 and early-November 2018, MinedMap and Serenity transported **2,689** Miners to Northway.  See List of Miners Serenity and MinedMap Transferred to Northway, attached hereto as **Exhibit 5**.

89.    MinedMap and Serenity's Miners were to be plugged in 21 days from receipt.  Agreement II, at 1–2.

90.    However, like Québec Inc.'s Miners, MinedMap and Serenity's Miners were never plugged in.

91.    Neither Northway nor Maranda intended to plug-in Serenity and MinedMap's Miners.

92.    In November 2018, Mr. Kim and Mr. Song inquired about their Miners.

93.    Mr. Song and Mr. Kim specifically inquired as to whether their Miners had been plugged in.

94.    Maranda did not respond for a while, but when he responded, he claimed the Miners would soon be plugged in.

95.    By October 2018, the Miners still had not been plugged in.

96.    Mr. Song and Mr. Kim continued to inquire about the Miners, but Maranda was not responsive.

97.    When Maranda responded, he claimed an unspecified issue with the Facility and stated he was sending the Miners to Louisiana to be hosted by another facility, managed by individuals named Prit and Akshard.

98.    On November 13, 2018, Maranda claimed he would transfer MinedMap and Serenity's Miners, without cost to MinedMap and Serenity, and that he would use their deposit to make the payments to the facility in Louisiana.

99.    Maranda did not transfer the Miners to any facilities in Louisiana.

100.    In November 2018, Mr. Kim contacted Prit and Akshard, the individuals who owned the facility in Louisiana to determine whether Northway had sent it MinedMap and Serenity's Miners to it.

101.  Prit and Akshard told Mr. Kim and Mr. Song that they did not know Maranda or Northway and that they it had not received Miners from Maranda or Northway.

102.    In addition, the facility in Louisiana stated that it had not received any deposit from Maranda or Northway.

103.    Mr. Kim and Mr. Song contacted Maranda and asked for the Miners.

104.    Maranda acknowledged that the Miners had not been transferred to Louisiana but did not provide a reason.

105.    Maranda claimed, via text, he had transferred the Miners to another location in New York, but that statement was false.

106.    Maranda never plugged in MinedMap and Serenity's Miners.

107.    On February 15, 2019, Mr. Kim and Mr. Song demanded the return of their Miners.

108.    Maranda and Northway have refused to return MinedMap and Northway's Miners.

109.    In March 2019, Maranda transferred MinedMap and Serenity's Miners to third parties.

110.    The third parties to whom Maranda and Northway transferred some or all of Serenity and MinedMap's Miners were warned against taking possession of Serenity and MinedMap's Miners.

111.    In late-March 2019, Northway hired Michael Carter, an electrician, and transferred nearly all of MinedMap and Serenity's Miners to Michael Carter.

112.    Michael Carter, Hudson, and others associated with Northway, have been negotiating with Simpleray, a solar company, to obtain solar power to operate Serenity and MinedMap's Miners.

113.    Maranda, Michael Carter, Northway and other individuals and entities are using Serenity and MinedMap's Miners to mine for bitcoins.

114.    Maranda, Michael Carter, Northway and other individuals have been earning income from Serenity and MinedMap's Miners.

115.    The incomes earned from Serenity and MinedMap belong solely to Serenity and MinedMap.

116.   None of the third parties who have received Serenity and MinedMap's Miners are bona fide purchasers.

117.   All individuals and entities who received MinedMap and Serenity's Miners are liable to Serenity and MinedMap for conversion and theft.

118.   Serenity and MinedMap have lost profits because they have been denied the right to use their Miners.

119.   In January 2019, Serenity and MinedMap obtained an offer from a Canadian company to host their Miners.

120.   Had Serenity and MinedMap timely received their Miners, they would have earned at least $1 million dollars to date.

121.   Maranda, Northway, Michael Carter and others have caused Serenity and MinedMap to lose substantial income as a result of their theft.

122.   Michael Carter has taken sums that would otherwise belong to MinedMap and Serenity and used them for his own benefit.

123.   As recently as late March 2019, Michael Carter entered into an agreement with Northway under which he claims to own thirty-five percent of Northway was transferred to him.

124.   Shares in Northway was transferred to Michael Carter and to other third parties to allow Maranda and Northway to hinder, delay, or defraud their creditors.

125.   Michael Carter and other third parties knew that the Miners did not belong to Northway or Maranda, but, despite this knowledge, Michael Carter and the third parties willingly assisted Northway and Maranda in defrauding Northway's creditors.

15

126.   Michael Carter specifically assisted Maranda in hiding assets by changing the titles to those assets into Michael Carter's name and into the names of other third parties.

127.   Michael Carter transferred cars and other assets that Maranda purchased using Plaintiffs' deposits to Miami to defraud their creditors.

128.   Maranda did not tell Mr. Kim and Mr. Song that Northway was struggling financially, and that Northway did not have capital.

129.   Michael Maranda have been attempting to sell Miners that appear identical to MinedMap and Serenity's Miners.

130.   Northway Mining is wrongfully withholding MinedMap and Serenity's Miners without any legal basis for doing so.

131.   MinedMap and Serenity seek an Order from this Court ordering the United States Marshall to break open, enter and search for the Miners at 2 Flint Mine Road Coxsackie, New York 12051. Sufficient probable cause exists to believe that the Miners are at 2 Flint Mine Road Coxsackie, New York 12051 because that is where they were delivered.

132.   Northway Mining and the remaining Defendants do not have any colorable legal basis for keeping the Miners.

133.   MinedMap and Serenity seek an Order of Seizure without Notice because Northway Mining is in the process of transferring or selling the Miners to third parties.

134.   The value of the Miners, based on current market valuation, is $900,000.00.

## COUNT I:
### (RICO ACT VIOLATIONS: Against All Defendants)

135.   Plaintiffs incorporate the previous allegations as if fully set forth in this paragraph.

136.   Plaintiffs' claims arise under Section 1964(c) of RICO, and Plaintiff asserts claims for violations of Section 1962(c) and (d) of RICO.

## A.   The Enterprise

137.   Defendants created an association-in-fact enterprise that consists of Maranda, Svorai, Northway, Mining Power, Michael Carter, and other third parties.

138.   The purpose of this enterprise was to defraud bitcoin companies in the United States and around the world by representing Northway to be a reputable bitcoin hosting company.  Once the bitcoin companies fell for the ruse, Northway would take large amounts of deposits from them and take their Miners, mine bitcoins, and use the deposits and the bitcoins for Northway, Maranda, Svorai, Michael Carter and other third parties' own benefit.

139.   The activities of Defendants' enterprise affected interstate and international commerce because monies were wired through interstate commerce and because the Miners traversed interstate and international commerce to reach Northway.

140.   In violation of Section 1962(c), Defendants conducted or participated and conspired to participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, and, in so doing, proximately caused injury to Plaintiffs.

141.   The individual defendants are persons within the meaning of Section 1961.

142.   Each of the individual defendant knew the essential scope of the Enterprise and each of the individual defendants intended to participate in the affairs of the Enterprise.

143.   Each of the Defendants played discrete roles in the Enterprise: (1) Maranda misrepresented Northway and its capabilities even though Maranda knew Northway could not host thousands of

Miners; (2) Svorai, Mining Power, and Maranda, misrepresented Northway's financial condition to make it appear as if Northway was financially sound and did not need to steal from Plaintiffs and others; (3) Michael Carter schemed to obtain Serenity and MinedMap's Miners even though Mr. Kim and Mr. Song has warned him against taking the Miners; (4) Michael Carter stole large sums of money from Serenity and MinedMap's Miners; (5) Michael Carter engaged in an extensive practice of hiding Maranda's assets in New York and in Miami, Florida.

### B.   Specific Acts of Racketeering

144.   Defendants engaged in a pattern of racketeering activity as that term is defined in Section 1961, in that Defendants committed at least two acts of racketeering within 10 years of each other.

145.   Specifically, as more particularly described below, Defendants committed discrete violations of 18 U.S.C. §§ 1341 and 1343 during a one-year period to the present.

### i.   Mail Fraud

146.   Under 18 U.S.C. § 1341, federal law imposes criminal sanctions on anyone who:

> Having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to . . . distribute, supply furnish or procure for unlawful use any counterfeit or spurious article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do . . . places in any post office or authorized depository for mail matter, any matter of thing whatever to be sent or delivered by postal service . . . or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter of thing.

147.   Defendants knowingly devised a scheme or artifice to defraud Plaintiffs, or for obtaining money of Plaintiffs' properties by means of false pretenses, false representations, or promises or by distributing counterfeit and spurious articles.

148.   Each Defendant acted with the requisite intent to default Plaintiffs.

149.   In advancing, furthering, or carrying out the scheme to defraud Plaintiffs, upon information and belief, Defendants used the mails, or caused the mails to be used, in furtherance of their scheme to defraud Plaintiffs.

150.   As just one example, Defendants caused Plaintiffs to ship more than 3,600 Miners to them through commercial mail delivery services.

151.   Each such use of the mails was in violation of 18 U.S.C. § 1341.

152.   Defendants acts of mail fraud constitute discreet Predicate Offenses under Section 1961.

### ii.    Wire Fraud

153.   Under 18 U.S.C. § 1343, federal law imposes criminal sanctions on anyone who:

> Having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

154.   Defendants knowingly devised a scheme to defraud or obtain money or property from Plaintiffs by making materially false or fraudulent pretenses, representations, or promises.

155.   Each Defendant acted with the requisite intent to defraud Plaintiffs.

156.   Each Defendant knowingly (and collectively) devised a scheme to defraud or obtain money or property from Plaintiffs by materially false or fraudulent pretenses, representations, or promises.

157.   In advancing, furthering, or carrying out the scheme to defraud Plaintiffs, Defendants transmitted by means of wire or caused to be transmitted by means of wire, writings, signs, signals, and pictures for the purpose of executing their scheme, the following:

   a.   Defendants sent numerous text messages via Apple Message Application and by other similar message applications from August 2, 2018 through the present;

   b.   On September 21, 2018, Defendants sent an email making fraudulent misrepresentations;

   c.   On September 28, 2018, Defendants sent several text messages making misrepresentations to Plaintiffs; and

   d.   On or around November 13, 2018, Defendants sent several text messages to Plaintiffs making fraudulent representations to Plaintiffs.

158.   The wires affected interstate and international commerce.

159.   The uses of wires were each in violation of 18 U.S.C. § 1343.

160.   The acts described above constitute discrete Predicate Offenses under § 1961.

   iii.   **Pattern of Racketeering**

161.   The predicate offenses as described above had the same or similar purposes, results, participants, victims, and methods of commission, and are otherwise interrelated by distinguishing characteristics and were not isolated events.

162.   Defendants' development of new companies and the transferring of assets in the name of other individuals included at least two acts of Wire Fraud over a period of more than two years.

163.   Defendants' commission of the Predicate Offenses included multiple acts of mail and wire fraud constitute conduct that extends temporally from the past into the future with a threat of repetition.

164.   Defendants' commission of the Predicate Offenses evidenced continuity because both amounted to a closed period of repeated conduct as well as conduct that extended temporally from the past into the future with a threat of repetition.

## COUNT II:
### (REPLEVIN FOR MINERS: Against All Defendants)

165.   Plaintiffs incorporate the preceding allegations as if they are fully set forth in this paragraph.

166.   Defendants are in possession of Miners that belong to Serenity and MinedMap.

167.   Plaintiffs, Serenity and MinedMap have superior possessory right to the Miners.

168.   Plaintiffs, Serenity and MinedMap, are entitled to immediate possession of their Miners.

169.   Plaintiff have attached an Emergency Motion under CPLR 7218 made applicable in this Court through Fed.R.Civ.P 64.

## COUNT III:
### (CIVIL CONSPIRACY: Against All Defendants)

170.   Plaintiffs incorporate the preceding allegations as if they are fully set forth in this paragraph.

171.    Defendants entered into an agreement to defraud Plaintiffs of their money and their Miners; in addition, Defendants entered into a conspiracy to remove Plaintiffs' Properties out of Plaintiffs' custody possession or control.

172.    Defendants undertook an overt act in furtherance of their agreement in that Defendants opened bank accounts; received money and miners form Plaintiff based on false representations; transferred properties out reach of Plaintiffs.

173.    Each Defendant intentionally participated in the furtherance of the plan and the purpose of the plan.

174.    Plaintiffs suffered damages as a proximate cause of Defendants' actions in an amount to be proven at trial.

**COUNT IV:**
**(CONVERSION: Against All Defendants)**

175.    Plaintiffs incorporate the preceding allegations as if they are fully set forth in this paragraph.

176.    Plaintiffs have a possessory right and property interests in their Miners and the deposits they paid to Defendants.

177.    Defendants have exercised dominion and control over Plaintiffs' Miners and money so as to deprive Plaintiffs of the Miners and money.

178.    Plaintiffs are entitled to damages in amounts to be proven at trial.

## COUNT V:
### (FRAUD: Against All Defendants)

179.   Plaintiffs incorporate the preceding allegations as if they are fully set forth in this paragraph.

180.   Defendants materially misrepresented facts about Northway's Facility, about Maranda's intention and use of Plaintiffs' funds, about Northway's capitalization, about Svorai and Mining Power's ability to finance Northway, among other misrepresentations.  In addition, Defendants misrepresented the ownership of Plaintiffs' Miners.

181.   Defendants knew at or near the time they were making the misrepresentations that he misrepresentations were false.

182.   Defendants induced Plaintiffs to rely on their representations.

183.   Plaintiffs relied on Defendants' representations.

184.   Plaintiffs' reliance was justified.

185.   Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VI:
### (BREACH OF CONTRACT: Against Northway, Mining Power, Dror Svorai, and Maranda)

186.   Plaintiffs incorporate the preceding allegations as if they are fully set forth in this paragraph.

187.   Defendants entered into a contract with Plaintiffs.

188.   Among other obligations, Defendants were required to install Plaintiffs' Miners so that Plaintiffs could earn incomes from their Miners on behalf of their investors.

189.   Plaintiffs performed their obligations under the Contract in that Plaintiffs paid Defendants large deposits and transported their machines to Northway Facility.

190.   Defendants breached their agreements with Plaintiff by failing to install Plaintiffs' Miners.

191.   Plaintiffs are entitled to damages in amounts to be proven at trial.

## COUNT VII:
### (FRAUDULENT TRANSFER: Against All Defendants)

192.   Plaintiffs incorporate the preceding allegations as if they are fully set forth in this paragraph.

193.   Defendants have conveyed Miners and money owned by Plaintiffs to each other and to various third parties.

194.   At the time Defendants conveyed Plaintiffs' Miners and money, the conveyance was made without fair consideration.

195.   Defendants were insolvent or rendered insolvent because of the transfer.

196.   Further, Defendants committed the transfer to hinder, delay, and defraud creditors.

197.   Plaintiffs are entitled to damages in amounts to be proven at trial

## COUNT VIII:
### (UNJUST ENRICHMENT: Against All Defendants)

198.   Plaintiffs incorporate the preceding allegations as if they are fully set forth in this paragraph.

199.   Defendants were enriched by keeping Plaintiff's Miners, the bitcoins mined from Plaintiffs' Miners, and the deposits Plaintiffs made to Defendants.

200.   Defendants benefitted at Plaintiffs' expense.

201.   It is against equity and good conscience to permit Defendants to retain Plaintiffs' deposits, Plaintiffs' Miners, and the bitcoins Mined from Plaintiffs' Miners.

202.   Plaintiffs have incurred damages to be proven at trial.

WHEREFORE, based on the foregoing, Plaintiffs seek the following reliefs:

   (i)     For the return of all of Plaintiffs' Miners;
   (ii)    For treble damages on all monetary damages Plaintiffs suffered;

   (iii)   For all sums Defendants have earned from operating Plaintiffs' Miners;

   (iv)    For attorney fees and costs;

   (v)     For all equitable relief this court deems proper under the laws of the state of New York;

   (vi)    For moratory interests on all damages incurred by Plaintiffs; and

   (vii)   For all other relief this Court determines to be proper under the laws of the states of New York and under Federal law.


Dated as of April 15, 2019
New York, New York

                                        T. Edward Williams, Esq.
                                        T. Edward Williams, Esq.
                                        Williams, LLP as Partnership of
                                        Peyrot and Associates, P.C.
                                        Tel: 646.650.2785
                                        Direct: 646.650.5139
                                        Fax: 646.650.5109
                                        Edward.williams@peyrotlaw.com
                                        62 William Street, 8th FL
                                        New York, New York 10005