**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**9384-2557 QUEBEC, INC., a Canadian corporation;**
**MINEDMAP, INC. a Nevada corporation; and**
**SERENITY ALPHA, LLC, a Nevada limited liability**
**company**

                                     **Plaintiffs,**

     **v.**                                               **1:19-CV-501**
                                                            **(TJM/CFH)**

**NORTHWAY MINING LLC, a New York limited**
**liability company, et al.,**

                                     **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**

                         **DECISION & ORDER**

        Before the Court is the motion to dismiss of Defendants Hudson Data Center, Inc.,

Michael Maranda, Michael Maranda, LLC, and Northway Mining, LLC. See dkt. # 55. The

parties have briefed the issues, and the Court will decide the motion without oral argument.

Plaintiffs have moved to amend their Complaint a second time. See dkt. # 50. The Court

will also address that motion, as appropriate.

**I.      BACKGROUND**

        Plaintiffs initially filed this action on April 12, 2019 in the United States District Court

for the Eastern District of New York. See dkt. # 1. On April 23, 2019, the Hon. Brian M.

Cogan, United States District Judge, issued a writ of replevin directing the United States

Marshal to seize certain property at issue in this litigation. See dkt. # 12. The next day,

1

Judge Cogan vacated that order, finding that the property was located in the Northern District of New York and that he lacked authority to direct seizure of property outside the judicial district in which he sat.  See docket entry for April 24, 2019.  The next day, Judge Cogan ordered the case transferred to this District.  See docket entry for April 25, 2019. The Court then granted the motion for a writ of replevin on April 29, 2019.  See dkt. # 19. Disputes about recovery and disposition of that property continue.

On March 12, 2020, Plaintiffs filed an Amended Complaint in this court.  See dkt. # 29.  The Amended Complaint concerns a dispute over "bitcoin miners."  Bitcoin is a digital currency that owners can use on-line to trade for actual currency or goods and services. See "Bitcoin" available at https://www.britannica.com/topic/Bitcoin (visited 2/4/2021). Bitcoin allows users to participate in exchanges without using banks or governments as intermediaries.  Id.  Bitcoin uses "public key cryptography" to transfer funds.  Id.  "[U]sers have a public key that is available for everyone to see and a private key known only to their computers."  Id.  Parties trade Bitcoins when the receiver sends her public key to the user transferring the Bicoin.  Id.  The transferor then signs with her private key, and the transaction goes "over the Bitcoin network."  Id.  Each transaction is logged to a ledger file on each node of the network.  Id.  Users stay mostly anonymous, though anyone can see that a transfer occurred.  Id.  These transactions are grouped together in "blocks," which are then "organized together in a chronological sequence called the blockchain."  Id. "Blocks are added to the chain" through "a mathematical process that makes it extremely difficult for an individual user to hijack the blockchain."  Id.  Many experts have remarked that blockchains offer "a basis for allowing trustworthy record-keeping and commerce without a central authority."  Id.

2

This litigation centers in part around Bitcoin "miners," and explaining them in some detail is useful.  As an on-line encyclopedia explains:

> New Bitcoins are created by users running the Bitcoin client on their computers. The client "mines" Bitcoins by running a program that solves a difficult mathematical problem in a file called a "block" received by all users on the Bitcoin network.  The difficulty of the problem is adjusted so that, no matter how many people are mining Bitcoins, the problem is solved, on average, six times an hour.  When a user solves the problem in a block, that user receives a certain number of Bitcoins.  The elaborate procedure for mining Bitcoins ensures that their supply is restricted and grows at a steadily decreasing rate.  About every four years, the number of Bitcoins in a block, which began at 50, is halved, and the number of maximum allowable Bitcoins is slightly less than 21 million. As of late 2017 there were almost 17 million Bitcoins, and it is estimated that the maximum number will be reached around 2140.

Id.

Plaintiff Serenity Alpha, LLC ("Serenity Alpha"), is a Nevada bitcoin mining company.  Amended Complaint, dkt. # 29, at ¶ 4.  Plaintiff MinedMap, Inc. ("MindedMap"), is also a Nevada Corporation and Serenity's parent.  Id. at ¶ 5.  MinedMap "specializes in owning and purchasing bitcoin mining machines."  Id.  Plaintiff 9384-2557 Quebec Inc. ("Quebec") is a Canadian company also involved in bitcoin mining.  Id. at ¶¶ 6, 29.

Plaintiffs allege that "[d]emand for bitcoins increased bitcoin companies' need to create (or mine) more bitcoins."  Id. at ¶ 2.  "Around August 2018," Plaintiffs began to seek "a facility to house their bitcoin mining machines ("Miners") to allow them to mine bitcoins."  Id.  A proper facility can "simultaneously" "host thousands of Miners."  Id.  Such a facility needs "access to abundant electricity."  Id.  Plaintiffs contend that such facilities "require Miners' owners to make a large deposit" to pay for the cost of such electricity.  Id.  Once the facility receives such a deposit, the facility and the owners of the miners enter into "a hosting agreement."  Id.

Plaintiffs here sent more than 3,600 miners to a facility in Coxsackie, New York

3

controlled by Defendants Michael Maranda and Northway Mining, LLC.  Id. at ¶ 3.

Plaintiffs allege that Defendants represented that their facility had access to sufficient

electrical power to host thousands of miners.  Id.  Relying on these representations,

"Plaintiffs made large deposits with Defendants[.]" Id.  Rather than using these funds to

buy electrical power, however, Defendants bought personal items, paid home mortgages,

and made other purchases to benefit themselves.  Id.  Plaintiffs allege that Defendants

knew in June 2018 that the facility lacked the capacity to host 200 miners, much less the

3,600 that Plaintiffs sought to place there.

    Around August 2018, Quebec, Inc., MinedMap and Serenity all sought a company

that could host their miners.  Id. at ¶ 29.  Jason Girosan and Gabriel Cyr of Quebec, Inc.

met Joseph Stefanelli that month.  Id. at ¶ 30.  Defendant Michael Maranda had hired

Stefanelli in July 2018.  Id. at ¶ 25.  Stefanneli was "a broker with connections to bitcoin

companies in the United States and abroad."  Id.  Defendant Northway Mining LLC agreed

to pay Stefanelli a finder's fee for introducing Maranda to bitcoin mining companies.  Id. at

26. Northway failed to disclose that Stefanelli's fee would come from deposits bitcoin

companies made to Northway.  Id. at ¶ 27.  Plaintiffs allege that Maranda directed

Stefanelli to tell bitcoin companies that "(i) Northway had a large mining Facility; (ii)

Northway's Facility had access to abundant power at competitive prices; and (iii) Northway

could host thousands of Miners at any given time in its Facility."  Id. at ¶ 28 (emphasis

removed from original). When he met Girosan and Cyr, Stefanelli told them that

Northway's facility could simultaneously host "thousands of Miners" and had "abundant

electrical power."  Id. at ¶¶ 31-32.

4

Girosan and Cyr met with Maranda in New York on September 9, 2018 to review the facility.  Id. at ¶ 33.  During the visit, Maranda again promised that the facility had sufficient electrical power and could host thousands of miners simultaneously.  Id. at ¶ 33.[1] Plaintiffs allege that Girosan and Cyr could not test Maranda's assurances.  Id. at ¶ 35. Maranda attested that Northway had electrical engineers and others on staff who could care for and maintain Plaintiffs' miners.  Id. at ¶ 36.  No such staff attended the meeting between the three.  Id.

Relying on these representations, Quebec sent 700 of its miners to Northway on September 9, 2018.  Id. at ¶ 37.  Northway was to serve as host for the miners.  Id. Quebec also sent Northway $46,746.09 as a deposit to pay for the electrical costs of hosting.  Id. at ¶ 38.  The parties executed a hosting agreement on September 18, 2018, and Quebec deposited an additional $23,255.66 with Northway.  Id. at ¶ 39.

The agreement required that Northway have Quebec's miners plugged in and operating by September 23, 2018.  Id. at ¶ 40.  Quebec deposited an additional $23,824.42 as a final deposit payment to Northway on September 21, 2018.  Id. at ¶ 41.

Northway had not plugged the miners in by September 24, 2018.  Id. at  ¶ 42. When Quebec inquired about the miners, Maranda did not respond immediately.  Id. at ¶ 43.  When he responded, Maranda "claimed that the Power Distribution Unit ("PDU") and the power racks were defective."  Id. at ¶ 44.  Despite these issues, Maranda promised to have the miners plugged in on or before September 25, 2018.  Id. at ¶ 45.  When Girosan and Cyr checked on that day, they found the miners had still not been plugged in.  Id. at ¶

---

[1]The pleading contains two paragraphs denoted as "33."  This sentence cites to the second such paragraph, which comes after paragraph 34.

46.

Girosan and Cyr contacted Maranda on September 25 about the miners.  Id. at  ¶

47.  Maranda claimed that the replacement power packs and the PDUs were also

defective.  Id.  at ¶ 48.  He claimed he had scheduled repair for September 28, 2018.  Id.

The miners still remained off-line on September 29, 2018.  Id. at ¶ 49.

Around that time, a third party familiar with Northway's facility told Quebec that

Northway's facility was not capable of hosting Quebec's 700 miners.  Id. at ¶ 50.  The

facility, Plaintiffs claim, lacked the capacity to transfer the power necessary to operate that

number of miners.  Id.  Plaintiffs allege that Marnada had known since June 2018 that the

facility could not host more than 200 miners.  Id. at ¶¶ 51-52.  He also knew that he lacked

the knowledge to install or maintain the miners.  Id. at ¶ 53.

Girosan and Cyr arranged to have Quebec's 700 miners returned to Montreal on

October 4, 2018.  Id. at ¶ 54.  Northway attempted to arrange a settlement agreement in

exchange for permitting Quebec to reclaim its miners.  Id. at ¶ 55.  Quebec refused and

picked up its miners on October 5, 2018.  Id. at ¶ 57.  Northway refused to return the

$93,826.17 in electricity deposits that Quebec had provided as well as sums that Quebec

had demanded to recover other expenses provided to Northway and the cost of

transporting and removing the miners from the facility.  Id. at ¶¶ 58-60.   Instead, Northway

hired an attorney and may have sued Quebec though Plaintiffs admit that Northway never

served a complaint on Quebec and that it is "unclear" whether Northway filed an action in a

court.  Id. at ¶¶ 61-63.  Still, Plaintiffs allege that "Northway's complaint was an effort to

intimidate Quebec[.]"  Id. at ¶ 64.

Defendant Maranda hired his 21-year-old nephew, Ryan Lehman, to serve as Chief

Financial Officer for Northway "[b]etween June and July 2018."[2] Id. at ¶ 19.  Plaintiffs

allege that Lehman and three other employees quit Northway in late October 2018.  Id. at

¶ 65.  These employees quit, Plaintiffs contend, "because they knew Maranda was

defrauding bitcoin companies."  Id. at ¶ 66.  The employees allegedly saw Maranda

"[misuse] funds deposited into Northway."  Id. at ¶ 67.  Maranda allegedly purchased cars,

made a down payment on a Miami condominium, made personal mortgage payments on

real property in New York, paid for hotel suites, and spent money on personal expenses,

none of which were related to the purchase of electricity.  Id. at ¶ 68.  The money that

Maranda allegedly misappropriated belonged to Quebec's investors, and Maranda's

misuse of that money damaged Quebec's business reputation.  Id. at ¶¶ 69-70.

        Daniel Kim and Allen Song of MinedMap and Serenity also met Stefanelli in August

2018.  Id. at ¶ 71.  Kim and Song went to the Northway facility in September, but

Maranada was not there that day.  Id. at ¶ 72.  Song returned on three other occasions in

September and October 2018.  Id. at ¶ 73.  Maranda was present during Song's three

visits.  Id. at ¶ 75.

        When Song visited in September 2018, Maranda represented to him that Northway

had recently obtained $1 million in funding.  Id. at ¶ 76.  That funding, Plaintiff alleges,

came from Defendants Mining Power Group, Inc. and Dror Svorai.  Id. at ¶ 77.  Maranda

allegedly claimed that the firm was well-capitalized and the $1 million in additional funding

would go towards purchasing another facility in Illinois.  Id. at ¶ 78.  Maranda sent items to

MinedMap and Serentiy that claimed that Northway had obtained the additional capital that

_____

        [2]The Court assumes that this phrase means "sometime in June or July 2018."

would permit Northway to expand.  Id. at ¶ 79.  Mining Power, Maranda, and Svorai never actually put that money in Northway.  Id. at ¶ 80.

Northway, Plaintiffs allege, was and remains "chronically undercapitalized."  Id. at ¶ 81.  Still, according to the Plaintiffs "Maranda, Svorai, and Mining Power had agreed to" tell Song and to issue a press release aimed at inducing Song and Kim to permit their companies' miners to be hosted by Northway.  Id. at ¶ 82.  The claim about the $1 million capital investment had been "concocted by Maranda, Svorai and Mining power to induce prospective bitcoin companies, like Plaintiffs, to enter into hosting agreements with Mining Power."  Id. at ¶ 83.  Maranda and Svorai did not have access to that money when they claimed they did.  Id. at ¶ 84.  By that point, Maranda's only source of income was deposits put up to supply electricity at the facility.  Id. at ¶ 85.

MinedMap and Serenity, relying on Maranda's assertions, signed a hosting agreement with Northway Mining on September 21, 2018. Id. at ¶ 87.  The agreement obligated MinedMap and Serenity to pay Northway the "(i) costs for electricity for operating their Miners; (ii) costs associated with maintaining the Miners at proper temperature and ensuring the physical condition in which Miners were stored were [sic] optimal; (iii) repairs [sic] costs plus a 10% mark up; (iv) internal labor Northway may incur in storing the miners; and (iv) other costs directly related to storing the Miners."  Id.

MinedMap and Serenity wired Northway $162,000 on September 21, 2018 as a deposit for electrical costs for the hosting.  Id. at ¶ 88.  MinedMap and Security wired an additional $270,000 for the same purpose "almost one week later."  Id. at ¶ 89.  Between October 8, 2018 and early November 2018, MinedMap and Serenity sent 2,689 miners to Northway.  Id. at ¶ 90.  The agreement required Northway to plug in the miners within 21

days of receipt.  Id. at ¶ 91.  Northway never plugged in the miners.  Id. at ¶ 92.  Plaintiffs allege that Northway had no intention of plugging in those miners.  Id. at ¶ 93.

Kim and Song inquired about the miners in November 2018, asking whether they had been plugged in.  Id. at ¶¶ 94-95.  Maranda did not respond immediately, but eventually told Kim and Song that the miners would be plugged in soon.  Id. at ¶ 96.  The miners had not been plugged in by October 2018.  Id. at ¶ 97.  Maranda did not respond to Song and Kim's additional inquiries about the miners.  Id. at ¶ 98.  When Maranda finally responded, he stated that, because of an "unspecified issue" at the facility, he would send the miners to Louisiana to be hosted by another facility.  Id. at ¶ 99.  That facility, Maranda claimed, was managed by persons named Prit and Akshard.  Id.  Maranda promised that the transfer would be without cost to MinedMap and Serenity, and that he would use their original deposit to make payments to the Louisiana facility.  Id. at ¶ 100.

Maranda failed to transfer the miners to Louisiana.  Id. at ¶ 101.  When Kim contacted the managers of the Louisiana facility in November 2018, they told him that they did not know Maranda or Northway.  Id. at ¶¶ 102-103.  They also told him that they had not received any miners from Maranda or Northway, nor had they received any deposit. Id. at ¶¶ 103-104.

Kim and Song then contacted Maranda and asked him to return the miners.  Id. at ¶ 105.  He admitted that the miners had not been transferred to Louisiana, but did not explain why.  Id. at ¶ 106.  Via text, he also claimed falsely that the miners had been transferred to another location in New York.  Id. at ¶ 107.  He never plugged in MinedMap or Serenity Alpha's miners.  Id. at ¶ 108.  Despite a demand from Song and Kim on February 19, 2019, Maranda and Northway have not returned MinedMap and Serenity

Alpha's miners.  Id. at ¶¶ 110-111.

Instead, Maranda transferred those miners to third parties in March 2019.  Id. at ¶ 111.  Those third parties had warnings against taking possession of Serenity Alpha's and MinedMap's miners.  Id. at ¶ 112.  None of these third parties, Plaintiffs claim, "are bona fide purchasers."  Id. at ¶ 118.  Northway hired Defendant Michael Carter, an electrician, in late March 2019.  Id. at ¶ 113.  Northway transferred nearly all of MinedMap's and Serenity's miners to Carter.  Id.  Carter, Defendant Hudson Data Center, and others associated with Northway have been negotiating with a solar company, Simpleray, to obtain solar power to operate the miners owned by MinedMap and Serenity.  Id. at ¶ 114.  Plaintiffs allege that Marana, Carter, Northway and "other individuals and entities are using" those miners to mine for bitcoins.  Id. at ¶ 115.  They are earning income from that activity, even though such income, Plaintiffs contend, belongs "solely to Serenity and MinedMap."  Id. at ¶¶ 116-17.

Serenity Alpha and MinedMap obtained an offer from a Canadian company to host their miners in January 2019.  Id. at ¶ 121.  If Serenity Alpha and MinedMap had received their miners, they would have earned at least $1 million dollars from their use.  Id. at ¶ 122.


Plaintiffs' Amended Complaint contains nine counts.  Count One alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, against all Defendants.  Count Two seeks replevin for bitcoin miners and money stolen from Plaintiffs.  Count Three alleges a civil conspiracy.  Count Four alleges conversion.  Count Five alleges fraud.  Count Six alleges breach of contract against Northway, Mining Power, Dror Svorai, and Maranda.  Count Seven alleges fraudulent

transfer.  Count Eight alleges unjust enrichment.  Count Nine alleges aiding and abetting

fraud against Defendant Coinmint, LLC.  Plaintiffs filed a second Amended Complaint

without seeking leave of Court on April 11, 2020.  See dkt. # 37.  Magistrate Judge

Hummel ordered that pleading struck on April 20, 2020 because Plaintiffs had not followed

the local rules in filing it.  See dkt.# 49.  Plaintiffs then filed a motion for leave to amend or

correct the Amended Complaint.  See dkt. # 50.  The parties briefed that issue.  Moving

Defendants then filed the instant motion to dismiss.  See dkt. # 55.  The parties briefed

those issues as well.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss

Defendants have filed a motion to dismiss Plaintiff's claims pursuant to Federal Rule

of Civil Procedure 12(b)(6).  Defendants argue that Plaintiffs have not stated a claim upon

which relief could be granted, even if all factual allegations in the complaint were proved

true.  In addressing such motions, the Court must accept "all factual allegations in the

complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."  Holmes v.

Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  This tenet does not apply to legal

conclusions.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."

Id. at 678.  "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (quoting

Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

### B.    Motion to Amend

Plaintiffs seek leave to amend their Complaint for a second time.  The Federal Rules of Civil Procedure provide that "leave to amend the pleadings should be 'freely give[n] . . . when justice so requires.'" AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725 (2d Cir. 2010)).  Generally, courts in this Circuit have permitted "'a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'" Id. (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d. Cir. 1993)).  Still, "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."  Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (quoting Forman v. Davis, 371 U.S. 178, 182 (1962)).  "In gauging prejudice, [courts] consider, among other factors, whether an amendment would 'require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute.'" Ruotolo v. City of New York, 514 F.3d 184, 192 (2d Cir. 2008) (quoting Block, 988 F.2d at 350).  "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.'" State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981)).  Prejudicial delay can occur when "the amendment [comes] on the eve of trial and would result in new problems of proof" such as a need for "a great deal of additional discovery."  Id.

## III.    ANALYSIS

Two separate motions are before the Court.  While the Court would normally consider a motion for leave to amend before considering a motion to dismiss–granting that motion would make the motion to dismiss moot–the Court will not do so here.  The

Defendants who move to dismiss the Complaint do not move to dismiss the entire

Complaint, and the Court would need to address the motion to amend in any case.

> **A.    Motion to Dismiss**

Defendants Northway Mining LLC, Michael Maranda, Michael Maranda LLC, and

Hudson Data Center Inc. ("Moving Defendants" or "Defendants") raise various grounds for

dismissing portions of the Complaint.  The Court will address each in turn.

> **i.    Service**

The moving Defendants first argue that the case should be dismissed because

Plaintiffs failed to serve the action on them within the time required by the Federal Rules of

Civil Procedure.  Plaintiffs respond that they served the Complaint within the time required

by the Federal Rules.  Even if they did not achieve service during that period, Plaintiffs

contend that they served their Complaint within the additional time provided by the Court.

In any case, Plaintiffs claim, they have good cause for any delays in service.  In reply, the

moving Defendants dispute Plaintiffs' claims about their efforts to obtain service.  They

also contend that they have raised the issue of service because of the long delay in

serving the Complaint on them "and the rest of the defendants[.]" Plaintiffs originally filed

the action in April 2019 in the Eastern District of New York and served the moving

Defendants on in March 2020.  They have still not served other named Defendants.  The

moving Defendants contend that "it has been unclear whether the plaintiffs are serious

about achieving joinder of issues with all named parties and moving the case forward."

Federal Rule of Civil Procedure 4(m) provides that "[i]f a defendant is not served

within 90 days after the complaint is filed, the court-on motion or on its own after notice to

the plaintiff–must dismiss the action without prejudice against that defendant or order that service be made within the specified time."  FED. R. CIV. P. 4(m).  The rule is not absolute, however: "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."  Id.  "Under Rule 4(m), if plaintiff demonstrates good cause for the failure of timely service the court must extend the time for service."  Coleman v. Cranberry Baye Rental Agency, 202 F.R.D. 106, 109 (N.D.N.Y. 2001).  "[D]istrict courts have discretion to grant extensions, and may do so even in the absence of 'good cause.'" Meilleur v. Strong, 682 F.3d 56, 61 (2d Cir. 2012).  "[T]he district court's determinations on whether good cause is present (and, if so, how long an extension would be appropriate) are exercises of discretion."  Zapata v. City of New York, 502 F.3d 192, 197 (2d Cir. 2007)).

The record shows that Plaintiffs filed their Complaint in the Eastern District of New York on April 15, 2019.  See dkt. # 2.  That court issued summonses on the same day. See dkt. # 6.  Plaintiffs sought a writ of replevin from that court on April 17, 2019.  See dkt. # 7.  Judge Cogan issued the writ of replevin on April 22, 2019.  See dkt. # 11.  On April 25, 2019, Plaintiffs filed an emergency motion for change of venue.  See dkt. # 13.  Finding that the property in question was located in the Northern District of New York, the Eastern District court granted the motion to change venue the same day.  See docket entry for April 25, 2019.  When the case arrived in this Court, Plaintiffs immediately renewed their motion for a writ of replevin.  See dkt. # 16.  The Court granted that motion on April 29, 2019 and issued an amended order on May 1, 2019.  See dkt. #s 19, 22.

The docket records no other case activity until Magistrate Judge Christian F. Hummel conducted a telephonic status conference on July 30, 2019.  See minute entry for

July 30, 2019.  The docket entry reveals that Plaintiffs' counsel "advised the court as to the status of the case," but Plaintiffs' counsel took no additional action in the matter until September 4, 2019, when he requested an ex parte telephone conference with the undersigned Judge.  See dkt. # 27.  On January 30, 2020, Plaintiffs' counsel wrote the Court with another status update, stating that "[a]s explained to the Court previously, Plaintiff have [sic] been working with law enforcement for the past six months regarding their claims.  That process has been completed and Plaintiff are [sic] prepared to proceed with this litigation.  Plaintiff will file a series of Motions within the next few days to move this matter forward."  Id.

Magistrate Judge Hummel conducted a telephonic status conference with Plaintiffs' counsel on February 10, 2020.  See minute entry for February 10, 2020.  The minute entry for that conference reveals that "Counsel advises the Court that service is being effectuated on Defendants and proof of service will be filed accordingly.  From there, the case should proceed in due course and in accordance with the Federal Rules of Civil Procedure."  Id.

Plaintiffs filed an Amended Complaint on March 12, 2020.  See dkt. # 29.  Plaintiffs also filed a letter motion requesting that the Court issue summons.  See dkt. # 30.  The Court issued summons for all the Defendants named in the Amended Complaint.  See dkt. # 32.  Plaintiffs filed returns of service for all of the moving Defendants on April 6, 2020, but have not yet filed returns of service for Coinmint, LLC, Mining Power Group, Inc., Porter King Hill Contracting, LLC, or Michael Carter.  See dkt. # 35.

Plaintiffs attempted to file a Second Amended Complaint on April 11, 2020.  See dkt. # 37.  Magistrate Judge Hummel struck that proposed pleading on April 20, 2020.  See

dkt. # 49.  Plaintiffs' submission, Magistrate Judge Hummel found, was "not in the proper form" because Plaitniff had not filed an affidavit or proposed amended pleading to accompany the motion for leave to amend.  Id.  Plaintiffs filed a motion for leave to amend in the proper format on May 1, 2020, and that motion is now before the Court.  See dkt. # 50.

The Court will deny the Defendants' motion in this respect.  It cannot be disputed that Plaintiffs did not serve their Complaint on Defendants within 90 days of filing it.  It also cannot be disputed that Plaintiffs waited months after transfer of the case to this District to request summons from the Court.  Service on the moving Defendants came eleven months after Plaintiffs filed the case in the Eastern District.  All of that could indicate that Plaintiffs failed to act with reasonable dispatch in serving the Complaint.  In addition, Plaintiffs have done little to explain the delays in service.  They also never filed a motion seeking an extension of time to serve the Complaint, and their explanations for why they did not serve the Complaint previously at some level demonstrate a lack of reasonable attention to this matter.

The Court notes, however, that the law in this Circuit permits a Court to extend the time for service even when the Plaintiff lacks good cause for failing to serve the Complaint. The facts of this particular case make clear to the Court that time for service should be extended in the case of the moving Defendants.  The Court will do so, and finds that Plaintiffs have served the moving Defendants in a timely fashion.  The Court takes this position because of the underlying facts of this case.  From the beginning, the Plaintiffs have had as a major purpose of their litigation the recovery of their bitcoin miners.  The Court has issued a writ of replevin, as did the Eastern District court.  Plaintiffs have been

16

frustrated in their efforts to execute the writ by the Defendants' actions, and that has consumed much of the first stages fo this litigation.  While the Plaintiffs should have acted with more dispatch, the other issues in this case help explain their delay.  More important to the Court, the moving Defendants do not offer any serious claim that they have been prejudiced by the delay in service.  They certainly cannot have been unaware that they were the subject of litigation about the Plaintiffs' servers, and they do not claim that the delays in serving the Complaint have led to the destruction of evidence or made important witnesses unavailable.  Defendants were able to respond to the Plaintiffs' action and have filed a credible motion to dismiss.  The Court will therefore exercise its discretion and permit an extension of time to serve the moving Defendants in this case.

At the same time, the Court agrees that Plaintiffs have not provided proof of service for some Defendants and that Plaintiffs must take action to achieve service or risk having the Court dismiss any claims against those Defendants.  Plaintiffs should take immediate action to serve those Defendants or the Court will dismiss them from the action.

### ii.    RICO Claims

Defendants next argue that the Court should dismiss Plaintiffs' claims brought pursuant to the Racketeer Influenced Corrupt Organizations Act ("RICO").  Defendants contend that Plaintiffs have failed to provide the Civil RICO statement required by the local rules.  Defendants further contend that Plaintiffs have not alleged sufficient continuity in Defendants' alleged racketeering activity to constitute a pattern of activity giving rise to a RICO claim.  Moreover, Defendants contend, Plaintiffs have not pled the racketeering activity they claim–which sounds in fraud–with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).

17

"To establish a civil RICO claim, a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'" Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F3d 106, 119 (2d Cir. 2013) (quoting Anatian v. Coutts Bank (Switz.) Ltd., 193 F.3d 85, 88 (2d Cir. 1999)). "The pattern of racketeering activity must consist of two or more predicate acts of racketeering." Id. "Those predicate acts must be the 'proximate cause' of the alleged injury." Butcher v. Wendt, 975 F.3d 236, 241 (2d Cir. 2020) (quoting Empre Merchs., LLC v. Reliable Churchill LLP, 902 F.3d 132, 140 (2d Cir. 2018)).

Defendants contend that Plaintiffs have failed to allege a pattern of racketeering activity because they have not pleaded either a closed-ended or an open-ended pattern of such activity. Even if Plaintiffs had pled such periods, Defendants insists, Plaintiffs' claims would fail because they have not alleged fraud with the particularity required by the Federal Rules of Civil Procedure. The Court will address each argument in turn.

### a.      Pattern of Racketeering Activity

A plaintiff alleging a civil RICO claim "must establish a 'pattern of racketeering activity'" to survive a motion to dismiss. Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (quoting GICC Capital Corp. v. Tech. Fin. Corp., 67 F.3d 463, 465 (2d Cir. 1995)). "RICO targets conduct that 'amount[s] to or pose[s] a threat of continued criminal activity.'" Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017) (quoting H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)). At issue here is whether Plaintiffs have alleged sufficient acts to demonstrate a continuing RICO enterprise. A party can demonstrate the "so-called 'continuity' requirement . . . either by showing a 'closed-ended' pattern–a series of related predicate acts extending over a substantial period of

18

time–or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period which the predicate acts were performed." Spool, 520 F.3d at 183.

Plaintiffs' brief alleges that their complaint pleads both an closed-ended and open-ended pattern of racketeering activity, but does little to explain how the Amended Complaint's allegations meet either of these standards.[3]

Plaintiffs' Amended Complaint alleges that Defendants engaged in a pattern of racketeering activity:

162.   The predicate offenses as described above had the same or similar purposes, results, participants, victims, and methods of commission, and are otherwise interrelated by distinguishing characteristics and were not isolated events.

163.   Defendants' development of new companies and the transferring of assets in the name of other individuals included at least two acts of Wire Fraud over a period of more than two years.

164.   Defendants' commission of the Predicate Offenses included multiple acts of mail and wire fraud and constitutes conduct that extends temporally from the past into the future with a threat of repetition.

165.   Defendants' commission of the Predicate Offenses evidenced continuity because both amounted to a closed period of repeated conduct as well as conduct that extended temporally from the past into the future with a threat of repetition.

Amended Complt. at ¶¶ 162-165.

-----

[3]After describing the legal standard, Plaintiffs offer the following argument:

Here, Plaintiffs have alleged an opened-ended and a closed-ended pattern of racketeering. See Plts. Orig. Compl. at ¶¶ 15-123. In addition, Plaintiff alleges a time, place, and content of the predicate offenses, which satisfies the particularity requirement. Nevertheless, Plaintiffs' RICO statement expounds on the open-ended and closed-ended nature of Defendants' pattern of racketeering. That statement is being submitted on Monday, May 25, 2020, if not sooner.

Plaintiffs filed their CIVIL RICO statement on May 26, 2020. See dkt. # 59.

Plaintiffs also supplied–belatedly–the Civil RICO statement required by the Local Rules.  See dkt. # 59.  That statement attempts to provide a listing of predicate acts and participants.  See id. at 5-9.  The statement alleges that from November 2017 through January 2018, Defendant Maranda and other participants in the enterprise established Northway and agreed that Northway "would be engaged in the business [of] the enterprise of stealing bitcoin machines and deposits from unsuspecting third parties."  Id. at 5.  They also obtained funding for the operation and distributed funds stolen by Northway to other participants in the scheme.  Id. at 6.

From February 2018 through May 2018, Plaintiffs claim, Maranda and the other participants in the enterprise formed several additional companies to facilitate the transfer of funds from their victims to the Defendants.  Id.  Defendants also "conspired to have Mining Power purchase a majority interest in Northway Mining on the sham statement of Mining Power investing $1 million" in Northway.  Id.  Defendants engaged in this activity to convince "Plaintiffs to send deposits to Northway and to place their miners at Northway's hosting sites[.]" Id.  This conduct convinced Plaintiffs and others to enter into agreements with Northway and furthered the scheme.  Id. at 7.  From June 2018 through December 2018, Plaintiffs allege, Defendants took Plaintiffs' miners and deposits and misappropriated their money.  Id. at 7-8.  Finally, Plaintiffs allege that from January 2019 to the present "Defendants have continued their scheme."  Id. at 8.  Two of the Defendants "left the scheme," one because Maranda had cheated him out of the enterprise's ill-gotten gains, and another because he had agreed to provide testimony about Defendants' alleged fraud.  Id.

### 1.    Closed-Ended Period

20

In addressing a closed-ended pattern of activity, the Second Circuit Court of Appeals "has never found a closed-ended pattern where the predicate acts spanned fewer than two years." First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 181 (2d Cir. 2004). The acts must span "'a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement.'" Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F3d 229, 242 (2d Cir. 1999) (quoting H.J., Inc., 492 U.S. at 242). "Although continuity is 'primarily a temporal concept, other factors such as the number of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists.'" First Capital, 385 F.3d at 181 (quoting Defalco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001)). "The duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit." Defalco, 244 F.3d at 321.

The Court finds that the allegations related above do not establish a closed-ended period of racketeering activity. First, the allegations of reported activity cover a period of less than two years, from November 2017 to December 2018. Courts in this circuit find allegations covering less than two years insufficient to state a closed-ended claim. See First Capital, 365 F.3d at 181. The Court may be too generous in attributing the entire period from November 2017 as a time when the enterprise occurred, since the predicate acts in question did not occur until after Defendants created the corporate vehicles necessary to take payment for hosting miners. If that were the case, the enterprise occurred over a space of months, not years. See DeFalco, 244 F.3d at 321. Second, the activity described during that period amounts to a single scheme that began with the conception of the scheme, followed by the creation of companies and the collection of

capital to execute the scheme, and then culminating in the conduct that led to the alleged theft of Plaintiffs' property.  Thus, during the brief period that Plaintiffs have described, they have alleged the creation of one allegedly fraudulent scheme, not a pattern of racketeering activity.  See First Capital, 365 F.3d at 181.

The Court therefore finds that Plaintiffs have not alleged a closed-ended period of racketeering activity.

### 2.    Open-Ended Period

If the plaintiff alleges open-ended continuity, "the plaintiff need not show that the predicates extended over a substantial period of time[.]" Cofacredit, 187 F.3d at 242. Instead, the plaintiff "must show that there was threat of continuing criminal activity beyond the period during which the predicate acts were performed."  Id.  "Where the enterprise engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity."  Id. at 242-43.  "The threat is generally presumed when the enterprise's business is primarily or inherently unlawful."  Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 185 (2d Cir. 2008).   If the enterprise is largely "a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity."  Cofacredit, 187 F.3d at 243.

Plaintiffs come closer to stating a claim here.  They allege that Defendants engaged in a scheme to obtain funds from unsuspecting persons or companies by claiming they had the ability to host a large number of bitcoin miners.  They allege that the scheme is ongoing, and that others will likely be ensnared in that scheme.  The allegations in the

22

Complaint and in the RICO statement, however, are largely conclusory and do not allege any particular facts about other parties harmed by the scheme.  Under those circumstances, the pleading is insufficient.  It simply "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action [.] Ashcroft v. Iqbal, 556 U.S. 662, 678 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id..  This claim lacks facial plausibility, and the Court cannot credit it.  The Court therefore finds that Plaintiffs have not pled open-ended continuity either.

### b.    Allegations of Fraud

Plaintiffs' Amended Complaint alleges that the acts constituting a pattern of racketeering activity involved mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343.  "Federal Rule of Civil Procedure 9(b) states that in averments of fraud, 'the circumstances constituting fraud . . . shall be stated with particularity.'"  Moore v. PaineWebber, Inc., 189 F.3d 165, 172 (2d Cir. 1999) (quoting Fed. R. Civ. P. 9(b)).  "This provision applies to RICO claims for which fraud is the predicate illegal act."  Id.  The heightened pleading standard "requires the plaintiff to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  Nakahata v. New-York Presbyterian Healthcare Sys., 723 F.3d 182, 197 (2d Cir. 2013) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  The plaintiff also "must 'allege facts that give rise to a strong inference of fraudulent intent.'"  Id. at 198 (quoting First Capital Asset Mgt. v. Satinwood, Inc., 385 F.3d 159, 179 (2d Cir. 2004) (emphasis in original)).

23

In claiming mail fraud, Plaintiffs allege:

148. Under 18 U.S.C. § 1341, federal law imposes criminal sanctions on anyone who:

> Having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to . . . distribute, supply furnish or procure for unlawful use any counterfeit or spurious article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do . . . places in any post office or authorized depository for mail matter, any matter of thing whatever to be sent or delivered by postal service . . . or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter of thing.

149. Defendants knowingly devised a scheme or artifice to defraud Plaintiffs, or for obtaining money of [sic] Plaintiffs' properties by means of false pretenses, false representations, or promises or by distributing counterfeit and spurious articles.

150. Each Defendant acted with the requisite intent to defraud Plaintiffs.

151. In advancing, furthering, or carrying out the scheme to defraud Plaintiffs, upon information and belief, Defendants used the mails, or caused the mails to be used, in furtherance of their scheme to defraud Plaintiffs.

151. [sic] As just one example, Defendants caused Plaintiffs to ship more than 3,600 Miners to them through commercial mail delivery services.

152. Each such use of mails was in violation of 18 U.S.C. § 1341.

Amended Complaint at ¶¶ 148-152.

In support of their claims of wire fraud, Plaintiffs allege:

154. Under 18 U.S.C. § 1343, federal law imposes criminal sanctions on anyone who:

> Having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses[,] representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

155. Defendants knowingly devised a scheme to defraud or obtain money or property from Plaintiffs by making materially false or fraudulent pretenses,

24

representations, or promises.

156.   Each Defendant acted with the requisite intent to defraud Plaintiffs.

157.   Each Defendant knowingly (and collectively) devised a scheme to defraud or obtain money or property from Plaintiffs by materially false or fraudulent pretenses, representations, or promises.

158.   In advancing, furthering, or carrying out the scheme to defraud Plaitniffs, Defendants transmitted by means of wire or caused to be transmitted by means of wire, writings, signs, signals, and pictures for the purpose of executing their scheme, the follwing:

    a.   Defendants sent numerous text messages via Apple Message Application and by other similar message applications from August 2, 2018;

    b.   On September 21, 2018, Defendants sent an email making fraudulent misrepresentations;

    c.   On September 23, 2018, Defendants sent several text messages making misrepresentations to Plaintiffs; and

    d.   On or around November 13, 2018, Defendants sent several text messages to Plaintiffs making fraudulent representations to Plaintiffs.

159.   The wires affected interstate and international commerce.

Id. at ¶¶ 154-159.

It is not clear to the Court if these allegations even meet the pleading standard under Rule 12(b)(6); they are largely conclusory, simply restating the elements of the fraud crimes and claiming that Defendants committed them.  Bryan A. Garner, ed., BLACK'S LAW DICTIONARY (8th Ed.), defining conclusory as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based.").  In any case, they fall far short of the particularity required under Rule 9(b).  Plaintiffs fail to identify any particular statements, much less explain their contents or why they were fraudulent.  These allegations do not "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Nakahata, 723 F.3d at 197 (internal citation omitted). Plaintiffs' fraud claims fail the pleading standard and are grounds for dismissal.

Plaintiffs' attempt to rescue their claims in their Civil RICO statement does not serve its purpose.  The statement in general alleges fraud, but makes no effort to describe the mail and wire fraud alleged in the Amended Complaint.  Instead, the statement simply alleges misrepresentations made by Defendant Maranda during a meeting with Serenity Alpha's Chief Financial Officer, Allen Song.  See dk. # 59 at 10-12.  The statement also describes how, in January 2019, Maranda attempted to avoid a request to return the bitcoin miners by sending text mesages.  Id. at 14.  "Maranda claimed he had used MindMap['s] $432,000 deposit to reconstruct one of his hosting sites and then his stories changed many times."  Id.  That statement also fails to offer any detail about the communications, but instead describes them in a general way.  The statement fails to explain why the statements were fraudulent.

In the end, then, Plaintiffs' allegations of fraud are too generalized to meet the requirements of Rule 9(b).  They fail to state a RICO claim in that respect as well.  The Court will therefore grant the Defendants' motion with respect to the Civil RICO claims contained in the Complaint.

While the Court doubts that Plaintiff can plead a RICO claim based on the facts of this case, the Court notes that dismissal here is predicated on insufficient pleading of facts, not admissions that make stating a claim legally impossible.  Under those circumstances, the Court will permit Plaintiffs to make another effort to plead their RICO claims.  The Court notes, however, that "[b]y presenting to the court a pleading, written motion, or other paper . . .  an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the legal arguments are "warranted by existing law or by a nonfrivolous argument" about what the

26

law should be and that the attorney has a reasonable basis for "the factual contentions" in the pleading.  FED. R. CIV. P. 11(b)(2), (3).  Plaintiffs should only re-plead this claim if they can satisfy this rule.

### iii.    Civil Conspiracy Claim

Defendants next argue that Court must dismiss Plaintiffs' civil conspiracy claim. They contend that New York law applies to this action, and that New York does not recognize the tort of civil conspiracy.  Plaintiffs respond that New York law permits a plaintiff to plead a civil conspiracy connected to another tort, and that their "civil conspiracy claim is tethered to numerous torts, including the intentional tort of conversion."  Beyond pointing to paragraphs 175-200 in the Amended Complaint, Plaintiffs make no attempt to explain this connection.

"New York does not recognize a freestanding claim for conspiracy."  Carlson v American Int'l Group, Inc., 30 N.Y.3d 288, 310 (N.Y. 2017).  "Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."  Alexander & Alexander, Inc. v. Fritzen, 68 N.Y.2d 968, 969 (N.Y. 1986).  "To establish a claim of civil conspiracy, the plaintiff must demonstrate the primary tort, plus the following four elements: an agreement between two or more parties; an overt act in furtherance of the agreement; the parties' intentional participation in the furtherance of a plan or purpose; and resulting damage or injury."  Cohen Bros. Realty Corp. v. Mapes, 181 A.D.3d 401, 404 (1st Dept. 2020).

Plaintiffs allege that:

172.    Defendants entered into an agreement to defraud Plaintiffs of their money and their Miners; in addition, Defendants entered into a conspiracy to remove Plaintiffs' Properties out of Plaintiffs' custody[,] possession or control.

27

173.   Defendants undertook an overt act in furtherance of their agreement in that Defendants opened bank accounts; received money and miners form [sic] Plaintiff based on false representations; transferred properties outreach [sic] of Plaintiffs.

174.   Each Defendant intentionally participated in the furtherance of the plan and the purpose of the plan.

175.   Plaintiffs suffered damages as a proximate cause of Defendants' actions in an amount to be proven at trial.

Amended Complt. at ¶¶ 172-175.  Plaintiffs plead counts for conversion and fraud against all Defendants.  Defendants do not seek dismissal of either of those claims.

The Court will deny Defendants' motion in this respect.  As explained, a New York plaintiff may plead a conspiracy claim that is based in a tort by alleging that defendants agreed together to commit a tort, took a step towards committing that tort, that they acted intentionally, and that the conspiracy injured the plaintiff.  Plaintiffs have made such allegations here.

### iv.   Venue or Forum for Quebec and Serenity Alpha

Finally, Defendants contend that a forum selection clause in the contracts between the parties requires the Court to dismiss the case against Quebec and Serenity in this forum.

"'[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of forum non conveniens.'" Starkey v. G. Adventures, Inc., 796 F.3d 193, 196 (2d Cir. 2015) (quoting Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex., 134 S.Ct. 568, 580 (2013)).  Under those circumstances, "the forum non conveniens doctrine's 'ususal tilt in favor of the plaintiff's choice of forum gives way to a presumption in favor of the contractually selected forum.'" Id. (quoting Martinez v. Bloomberg LP, 740 F.3d 211, 218 (2d Cir. 2014)).   Courts apply a four-part analysis in

28

applying a forum-selection clause, asking:

> (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, i.e., whether the parties are required to bring any . . . dispute to the designated forum or simply permitted to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause . . . If the forum clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable . . . A party can overcome this presumption only by (4) making a sufficiently strong showing that enforcement would be unreasonable or unjust or that the clause was invalid for such reasons as fraud or overreaching.

Id. at 196 (quoting Martinez, 740 F.3d at 217).

The contract between Northway Mining and Quebec, Inc., contains a forum selection clause.  See Exh. A. to the Declaration of Michael Maranda, dkt. # 55-3.  That clause states:

> This Agreement evidenced by the signature of the Parties below is made in Athens, New York, under, and shall be construed in accordance with, the internal laws of the State of New York of the United States without resort to New York's conflict of laws' [sic] provisions.  Any and all proceedings which may arise among the Parties regarding this Agreement shall be held in Greene County, New York.

Id. at 5.  The same provision exists in the contract between Northway Mining and Serenity Alpha.  See Exh. B to the Declaration of Michael Maranda, dkt. # 55-4, at 6.

Plaintiffs response offers extensive argument against dismissing the claims brought by Quebec, but offers no dispute concerning the claims brought by Serenity Alpha. Plaintiffs do not dispute that the language cited above existed in the contracts between Northway Mining and the two Plaintiffs.  Instead, Plaintiffs argue that Defendants have failed to explain whether they seek dismissal under Federal Rule of Civil Procedure 12(b)(3) or 12(b)(6).  Plaintiffs contend that "[t]his distinction . . . matters because the court must determine whether it may view documents outside of the pleadings (Rule 12(b)(3)) or

29

whether it is confined to the pleadings (Rule 12(b)(6)).  In addition, Plaintiffs claim, the

Court should deny the motion in this respect because "Defendants and Quebec expressly

rescinded the Agreement, and, on October 18, 2008, entered into a subsequent

agreement with Quebec, after Quebec picked up its bitcoin machines."  Further, "Quebec

seeks relief because although it obtained its bitcoin machines, Northway and Maranda did

not return more than $93,000.00 deposit [sic] from Defendant, Michael Maranda."

     As to Plaintiffs' contention that Defendants' motion should be denied because the

Defendants have not explained which Federal Rule of Civil Procedure under which they

proceed, the Court notes that the Supreme Court has "held generally that 'the appropriate

way to enforce a forum-selection clause pointing to a state or foreign forum is through the

doctrine of *forum non conviens* rather than through the Rule 12(b)(3)."  Martinez v.

Bloomberg, 740 F.3d 211, 217 (2d Cir. 2014) (quoting Atlantic Marine Construction Co.,

134 S.Ct. 568, 580 (2013)).  Defendants in part move for dismissal on that basis.  When a

party seeks dismissal based on *forum non conveniens* or "on a forum selection clause, a

district court typically relies on pleadings and affidavits, but must conduct an evidentiary

hearing to resolve disputed factual questions in favor of the defendant."  Id. at 216-17

(internal citation omitted).

     There is no dispute about the contents of the forum selection clause, and Plaintiffs

offer no argument that clause would not apply to their claims in place.  They offer no

argument that the clause does not apply to Serenity Alpha.  As such, the Court must find

that no factual dispute exists as to whether the forum selection clause precludes Serenity

Alpha from raising a claim arising out of the contract in this Court.  The Court will grant the

motion to dismiss on *forum non conveniens* grounds with respect to Serenity Alpha as

unopposed.

Plaintiffs dispute, however, that the forum selection clause applies to Quebec's

claims.  They argue, too, that an evidentiary hearing is necessary to determine whether the

clause applies.  The basis for this claim is not a dispute about the contents of the forum

selection clause, but about the effect of a subsequent agreement between Quebec and

Northway.  Plaintiffs point to part of an agreement between those parties signed on

October 18, 2018, which provides:

> Northway Mining, LLC hereby releases to 9384-2557 Quebec (sic) Inc. 22 pallets of
> Bitmain miners/power supply's [sic] which were previously removed from the
> racks/pulled out of service **due to contract cancellation** authorized by 9384-2557
> Quecbec [sic] Inc. staff/contractors whom [sic] prepared the pallets for freight
> transport.

Plaintiffs' Resposne, dkt. # 58, at 12 (emphasis in original) (grammatical corrections mostly

by the Plaintiffs).  Defendants deny that they entered into this agreement, though they

admitted that Quebec did attempt to terminate the Hosting Services Agreement.

The Court will grant the motion to dismiss on *forum non-conveniens* grounds.  The

Court also finds that the pleadings and documents attached thereto are sufficient to

resolve this dispute and no evidentiary hearing is necessary.  Whatever dispute exists

between the parties about the purported October 18, 2018 agreement, nothing in the

language quoted above indicates that the alleged contract cancellation voided any

previous forum-selection clause.  Plaintiffs admit that in this action they seek recovery of

funds paid to Northway under the terms of the contract that was in place when they paid

the funds.  That claim arises out of the contract, and is barred by the forum selection

clause. The forum selection clause requires that those claims be raised in Greene County.

Plaintiffs offer no other argument about why the forum selection clause should not be

31

enforced, and they do not attempt to make a "showing that enforcement would be unreasonable or unjust or that the clause was invalid for such reasons as fraud or overreaching." Starkey, 796 F.3d at 196. The Court will therefore grant the motion in this respect.

### B.    Motion to Amend

Plaintiffs' proposed Second Amended Complaint contains RICO allegations identical to those in the Amended Complaint. The Court has already determined that those allegations are insufficient to state a claim, but has permitted Plaintiffs to replead those claims if they can offer good-faith allegations of fraud that satisfy Rule 9(b). The proposed Second Amended Complaint also contains as Plaintiffs Serenity Alpha, LLC and 9384-2557 Quebec, Inc. The Court has dismissed both those Defendants pursuant to the doctrine of *forum non conveniens*. As such, the proposed Second Amended Complaint contains claims and parties that it would be futile to include, and the Court would normally deny the motion for leave to amend on that basis.

At the same time, the Proposed Second Amended Complaint also includes new claims and new parties. Defendants oppose adding those parties and those claims. While the Court could address Defendants' opposition at this point, the Court would come to the same conclusion on the RICO claims after addressing Defendants' opposition as it has here. Under those circumstances the Court concludes that the most efficient procedure would be to deny the Plaintiffs' motion for leave to file a Second Amended Complaint. The denial is without prejudice to Plaintiffs raising the claims in the proposed Second Amended Complaint upon which the Court has not yet ruled. Plaintiffs may also include RICO claims

in that Second Amended Complaint, but only if they have a good-faith basis to do so.[4]

Defendants may of course file any appropriate motion upon receipt of the Second

Amended Complaint.[5]

## IV.    CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss, dkt. # 55, is

**GRANTED** in part and **DENIED** in part.  The motion is **GRANTED** with respect to Plaintiffs'

RICO claim without prejudice to repleading.  The motion is **GRANTED** with respect to any

claims against Defendants Serenity Alpha and Quebec, Inc.  Those parties are dismissed

from the case on *forum non conveniens* grounds.  The motion is **DENIED** in all other

respects.  Defendant Michael Carter's motion to dismiss, dkt. # 113, is **GRANTED** in part

and **DENIED** in part as explained in footnote five of this opinion.  Defendants' motion to

deny the motion for leave to amend as untimely filed, dkt. # 52, is hereby **DENIED** as

moot.  Plaintiffs' may file a Second Amended Complaint within 21 days of the date of this

order.  Any amended pleading shall comply with the terms of this decision.  Plaintiffs'

motion for leave to amend, dkt. # 50, is hereby **DENIED**.  The Plaintiffs' amended pleading

may include claims and parties named in the proposed Second Amended Complaint, and

Defendants may file any appropriate motion in response to any amended pleading

Plaintiffs file.

---

[4]Defendants' letter motion requesting that the motion to amend be denied as late will be denied as well.  See dkt. # 52.

[5]Defendant Michael Carter also filed a motion to dismiss the Amended Complaint. See dkt. # 113.  To the extent that he raises the same grounds as the other Defendants, his motion is granted in part and denied in part for the same reasons as stated in this opinion.  To the extent that he raises additional grounds to dismiss, he may raise those grounds in reference to any amended pleading the Plaintiffs file.

33

**IT IS SO ORDERED.**

Dated: February 17, 2021

Thomas J. McAvoy
Senior, U.S. District Judge